UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **TIARA SMITH,**<br>114 East Lexington St., Apt. 810<br>Baltimore, MD 21202<br><br>        Plaintiff,<br><br>    v.<br><br>**BHS HOSPITAL SERVICES, INC., d/b/a**<br>**BOLDER HEALTHCARE SOLUTIONS,**<br>9200 Shelbyville Rd., Ste. 210<br>Louisville, KY 40222<br><u>Serve:</u>  CSC-Lawyers Incorporating Service Co.<br>        7 St. Paul St., Ste. 820<br>        Baltimore, MD 21202<br><br>    &<br><br>**RECEIVABLES OUTSOURCING, LLC, t/a**<br>**THE ROI COMPANIES,**<br>1920 Greenspring Dr., Ste. 200<br>Timonium, MD 21093<br><u>Serve:</u>  CSC-Lawyers Incorporating Service Co.<br>        7 St. Paul St., Ste. 820<br>        Baltimore, MD 21202<br><br>        Defendant. | Civil Action No. 1:20-cv-1062<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>COMPLAINT</u>**
**(Violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and**
**the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*)**

1. Defendants BHS Hospital Services, Inc., and Receivables Outsourcing, LLC terminated Plaintiff Tiara Smith the day that she provided proof of retaliation and support for her longstanding complaints about discriminatory work assignments. Plaintiff, who is black, was one of Defendants' top performers, and Defendants consistently recognized her strong performance in performance reviews and bonus awards. Despite Plaintiff's proven record, however, Defendants

routinely awarded more lucrative clients and accounts to white employees while depriving black employees, including Plaintiff, of the same opportunities and compensation. After Plaintiff's first complaints of race discrimination, Defendants began to treat her with hostility, suspended her for conduct unworthy of sanction, and criticized her use of leave that had been approved pursuant to the Family and Medical Leave Act of 1993 (FMLA). In April 2016, Plaintiff produced proof that accounts were manipulated to her disadvantage, and Defendants immediately terminated her for supposed "unsatisfactory performance," even though she was exceeding Defendants' performance standards by all objective measures. Defendants discriminated against Plaintiff and retaliated against her in violation of the Civil Rights Act of 1866 and interfered with the exercise of her rights and retaliated against her in violation of the FMLA.

## PARTIES

2. Plaintiff Tiara Smith is an adult female resident of Baltimore, Maryland.

3. Defendant BHS Hospital Services, Inc., doing business as Bolder Healthcare Solutions ("Bolder"), is a Delaware corporation doing business in Baltimore County at 1920 Greenspring Drive, Suite 200, Timonium, Maryland 21093.

4. Defendant Receivables Outsourcing, LLC, trading as The ROI Companies ("ROI"), is a Maryland limited liability company doing business in Baltimore County at 1920 Greenspring Drive, Suite 200, Timonium, Maryland 21093.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 because the matter in controversy arises under the laws of the United States, specifically, the Civil Rights Act of 1866, 42 U.S.C. § 1981(b), and the FMLA, 29 U.S.C. § 2601 *et seq*.

6. This Court has jurisdiction over Bolder because Plaintiff's causes of action arise out of Bolder's business transactions in Maryland and because Bolder's acts or omissions complained of herein were committed in Maryland.

7. This Court has jurisdiction over ROI because it is a Maryland limited liability company and its principal place of business is located in Maryland, because Plaintiff's causes of action arise out of ROI's business transactions in Maryland, and because ROI's acts or omissions complained of herein were committed in Maryland.

8. Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS GIVING RISE TO RELIEF

9. On or about February 10, 2014, ROI hired Plaintiff as an Inbound Bad Debt Collector.

10. Plaintiff is a black woman.

11. On or around June 25, 2015, Bolder acquired ROI, and ROI became Bolder's subsidiary. Thereafter, Bolder held itself out as Plaintiff's employer, supervised Plaintiff day-to-day, disciplined Plaintiff, furnished Plaintiff's equipment and place of work, possessed and exercised responsibility over Plaintiff's employment records, and engaged in other activities demonstrating the existence of an employment relationship with Plaintiff.

12. Post-acquisition, ROI also held itself out as Plaintiff's employer, supervised Plaintiff day-to-day, issued paychecks to Plaintiff, furnished Plaintiff's equipment and place of work, possessed and exercised responsibility over Plaintiff's employment records, and engaged in other activities demonstrating the existence of an employment relationship with Plaintiff.

13. On information and belief, Defendants have common management and ownership and frequently transfer employees between each entity. Bolder and ROI serve as agents for one another, and both entities allow Bolder to control employment decisions at both companies.

14. Defendants' business is to provide debt collection services to healthcare providers in Maryland, in addition to acting as the "business center" for certain clients.

15. During Plaintiff's employment, Defendants' management team assigned one or more collectors to "work" the delinquent accounts of each client-healthcare provider.

16. Defendants' management team also determined which clients were assigned to which collectors according to their discretion.

17. If more than one collector was assigned to a particular client, Defendants' management team determined each collector's workload according to an "alpha split" system, meaning that the management team assigned collectors specific accounts according to the first letter of the debtor's surname. Defendants' management team also determined each collector's alpha split.

18. Defendants' management team's decisions regarding the assignment of clients and individual accounts directly affected the ability of collectors to make their monthly quota, earn bonuses or commissions, and obtain cash awards, all of which were based on the amount collected by the employees.

19. Defendants' quota system required collectors to collect a set amount of payments from past-due accounts monthly.

20. Meeting or failing to meet the collector's quota for the month was referred to as "making budget" or "missing budget," respectively.

21. Further, Defendants assigned each client a "commission rate," and the commission rate differed from client to client.

22. Once a collector made budget for the month, the collector received a commission based on her client's commission rate. Where collectors were successful, these commissions amounted to a substantial portion of the collector's annual income.

23. Defendants also awarded the three most productive collectors for each month bonuses in the form of ranked prizes. For example, in a given month, Defendants would award the top collector $75, the next collector $50, and the third most productive collector $25.

24. Being assigned clients with higher commission rates necessarily increased the earning potential of a collector.

25. Additionally, being assigned certain clients enabled collectors to make budget more quickly and to earn higher commissions because some types of clients generally had outstanding accounts with higher balances. For instance, clients such as large, urban hospitals with shock trauma units generally had patients with higher-balance accounts than suburban or rural hospitals that did not provide similarly expensive services. Accordingly, working the accounts for a large, urban hospital generally was more efficient and result in higher commissions for a collector than would working accounts for a smaller suburban or rural hospital.

26. Similarly, working individual accounts with higher balances generally allowed collectors to meet their monthly quotas more easily and to earn more commissions and bonuses than would be possible had they worked accounts with lower balances.

27. Defendants' employees referred to accounts with high balances as "high-dollar accounts."

28.     Each month, Plaintiff's "team lead," a member of Defendant's management team, generated a list of high-dollar accounts according to each collector's alpha split and client assignment.

29.     The team lead then provided the collectors with their "high-dollar report" consisting of cases to focus on that month.

30.     At all times relevant hereto, Plaintiff successfully performed the duties of her position. From the beginning of her employment with Defendants, Defendants' management team continually praised Plaintiff's productivity as "outstanding." Plaintiff consistently received positive performance reviews and regularly exceeded her monthly quota. She also regularly received commissions and cash bonuses for winning "productivity contests" organized by Defendants.

31.     Because of her strong work performance, Defendants promoted Plaintiff to the position of Senior Collector in or around June 2016.

32.     On June 29, 2016, Plaintiff underwent her annual Performance Appraisal. Her supervisor Martin Woodall, a member of Defendants' management team, rated Plaintiff as "substantially exceed[ing] standard[s]" in the areas of communication and teamwork and rated her job performance, dependability, judgment, and attitude as "exceed[ing] standards." In all other areas, Woodall found that Plaintiff met Defendants' performance expectations. He noted specifically that she "exceeds her budget on a consistent basis."

33.     That same month, Defendants' management team approved Plaintiff's request for FMLA leave on an intermittent basis to manage a qualifying health condition.

*Racial Discrimination at Defendants' Business*

34. Defendants' management team consistently assigned more valuable clients—i.e., clients with higher commission rates, clients that provided more expensive services, and clients with delinquent accounts that had larger dollar amounts at stake—to white collectors than to non-white collectors. Defendants' discriminatory practices limited the earnings potential of non-white collectors by limiting potential commissions and bonuses in comparison to their white counterparts.

35. Further, in or around November 2016, Plaintiff's team lead Melody (Brittner) Hunt, reassigned several of Plaintiff's high-dollar accounts to a white collector named Jennifer Sizemore without any explanation or apparent reason. In fact, Plaintiff was well-situated to effectively work those accounts, while Hunt had previously disparaged Sizemore's competence and skill level in her collection abilities.

36. Similarly, Hunt reassigned the high-dollar accounts of other non-white collectors to white collectors for no apparent legitimate reason.

37. During December 2016, Plaintiff became concerned that there was a chance she might miss budget, despite working her accounts as hard as she had usually done.

38. On or about December 21, 2016, Plaintiff met with her supervisor Martin Woodall to discuss her concerns about race discrimination by Hunt in the assignment of high-dollar accounts.

39. During the meeting, Plaintiff complained to Woodall that Hunt had a pattern of reassigning Plaintiff's high-dollar accounts to white collectors. Plaintiff also told Woodall that the only other black collector on Hunt's team had also reported that Hunt had taken high-dollar accounts from her and reassigned them to white employees.

40. Plaintiff stated to Woodall that Hunt's pattern of taking high-dollar accounts from non-white employees and giving them to white employees was discriminatory.

41. In response, Woodall appeared not to take Plaintiff's complaints seriously. Instead, Woodall claimed ignorance of any purposeful or discriminatory practices and further stated that he trusted Hunt's judgment regarding the distribution of accounts.

42. Rather than address or agree to look into Plaintiff's concerns about race discrimination, Woodall instead then criticized Plaintiff, falsely accusing her of experiencing difficulty meeting her monthly quota because of what he claimed was "excessive" use of FMLA leave—even though Plaintiff was a high performer. Additionally, Plaintiff took only occasional, intermittent FMLA leave due to a serious health condition, and her absences did not interfere with her ability to perform well and over quota on a routine basis.

43. Woodall's inaccurate statement regarding Plaintiff's usage of FMLA leave deliberately discouraged Plaintiff from taking the FMLA leave to which she was entitled and reflected direct evidence that Defendants took Plaintiff's legal right to FMLA leave into account in order to disparage her job performance.

44. Although Woodall denied that Hunt was engaging in any discriminatory conduct, he nonetheless promised Plaintiff the next day that he would "right the ship," suggesting that he would ensure that the high-dollar accounts were distributed equitably.

45. Woodall, however, took no apparent action to ensure changes to the discriminatory assignments of high-dollar accounts.

46. After her meeting with Woodall, Plaintiff requested a follow-up meeting with Woodall and Hunt to discuss her concerns regarding the discriminatory assignment of high-dollar accounts.

47. Woodall agreed to the meetings on at least two occasions, but each time Woodall later postponed the meetings, claiming that he was busy.

48. Plaintiff then met with Hunt individually to express her concerns about the discriminatory assignment of high-dollar accounts. During their meeting, Hunt acknowledged that she had reassigned high-dollar accounts from Plaintiff to Sizemore and that more high-dollar accounts had been given to Sizemore than to Plaintiff. Nonetheless, Hunt denied that she had engaged in wrongdoing.

49. Following her meeting with Hunt, Plaintiff then went to Departmental Director Courtney Rudinoff and Defendants' Human Resources (HR) manager Grant Wunder and informed them Defendants were assigning high-dollar accounts in a discriminatory manner based on race.

50. After her complaints of racial discrimination, Defendants began to treat Plaintiff adversely in several respects.

51. Although Hunt had previously behaved in a relatively respectful and professional manner towards Plaintiff, after Plaintiff's race discrimination complaints, Hunt began to treat Plaintiff with hostility. For instance, on one occasion soon after Plaintiff's discrimination complaints, Hunt yelled at Plaintiff in front of coworkers over a trivial matter, which was intentionally humiliating and did humiliate Plaintiff.

52. On another occasion, Hunt purposefully changed the seating chart in order to place Plaintiff between two colleagues who notoriously engaged in loud discussions with one another, which Hunt knew would interfere with Plaintiff's work and comfort. Indeed, the reassignment resulted in significant disruption to Plaintiff's work. Hunt persisted in the assignment despite Plaintiff's requests not to be placed between those coworkers.

53. Additionally, notwithstanding the apparent unfairness of the assignments, Hunt continued to assign high-dollar accounts in a discriminatory manner, thereby depriving Plaintiff of the ability to earn and succeed on a level playing field with her white counterparts.

54. Plaintiff then complained to Wunder again regarding the discriminatory assignments and the retaliation she was experiencing.

55. Wunder promised to investigate Plaintiff's complaint. However, he never contacted Plaintiff to investigate or otherwise address her complaint with her. Indeed, despite her complaints, none of Defendants' managers or HR gave any indication to Plaintiff that anyone was looking into her report.

56. On or about February 8, 2017, Plaintiff and a fellow black coworker reviewed an open report on a colleague's desk, as was commonplace and typical among collectors at Defendants' workplace and had never been punished. In this instance, however, Plaintiff and her coworker were suspended without pay by Woodall for three days for purported "[u]nauthorized possession, tampering or use of property belonging to another associate or to the Company."

57. Throughout the winter and spring of 2017, Hunt continued to reassign Plaintiff's high-dollar accounts to white collectors, to the detriment of black collectors.

58. On March 31, 2017, Plaintiff emailed Wunder about the status of his investigation into her complaint of racial discrimination and retaliation.

59. That same day, Wunder wrote back that "[t]here has been a comprehensive investigation into your allegations, and we have found that there is no evidence of discrimination, unfair treatment, or any evidence of a hostile work environment" and that Defendants "consider[ed] this matter to be closed."

60.     On or about April 26, 2017, Plaintiff emailed another member of Defendants' management team, Anita Shaffer, to again complain about Hunt's manipulation of the assignments of high-dollar accounts. Plaintiff provided Shaffer with two examples of high-dollar accounts that rightfully should have been hers but had been reassigned by Hunt to another colleague in apparent retaliation for her complaints of discrimination.

61.     Shaffer acknowledged that the accounts should not have been reassigned and should have been assigned solely to Plaintiff. Shaffer wrote, "Both examples should be in your queue as you already know," and she promised to "go behind [Hunt]" so that Shaffer could "compare what she is giving the reps." Shaffer observed that "'[d]oing the high dollar report' is a manual process and as with anything manual there could be mistakes but I wouldn't think that there should be 2 mistakes (at least) in 2 weeks."

62.     Rather than remedying the situation, however, that very day Rudinoff and Wunder summoned Plaintiff into a meeting and terminated her. Defendants informed Plaintiff she was being terminated for "unsatisfactory performance," even though Plaintiff had exceeded her monthly quotas every month in 2017 and earned productivity bonuses every month between May 2016 and April 2017.

63.     During the conversation, Wunder told Plaintiff "it was no secret that things haven't been working out here for the last few months," apparently referring to Plaintiff's complaints of race discrimination and retaliation.

64.     In May 2017, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).

65.     In an April 18, 2018 position statement, Defendants stated that they terminated Plaintiff "in large part [because of] . . . her continued lackadaisical attitude toward her work,"

11

pointing to particular days and hours in April 2017 when Plaintiff allegedly failed to "meet [Defendants'] standard of 10 calls to accounts per hour."

66. In fact, Defendants purported "standard" of requiring collectors to make 10 calls to accounts per hour did not exist at the time of Plaintiff's termination or during the days in question

67. Further, many of the times noted by Defendants as representing "low productivity" in its position statement were times when Plaintiff was taking approved FMLA leave, thereby demonstrating that Defendants took Plaintiff's usage of FMLA leave into account as a negative factor in making the decision to terminate her.

68. The EEOC ultimately issued a Determination concluding that Plaintiff "was discharged in retaliation for engaging in a protected activity," namely, complaining of racial discrimination.

## COUNT ONE
**Racial Discrimination in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981(b)**

69. Plaintiff incorporates by reference and re-asserts each of the facts contained in paragraphs 1 through 68 of this Complaint with the same force and vigor as if set out here in full.

70. Plaintiff is black.

71. Plaintiff and Defendants had an employment relationship that is considered contractual under the Civil Rights Act of 1866.

72. Defendants discriminated against Plaintiff on the basis of race by treating her less favorably than white employees in terms of assignments, opportunities, advancement, compensation, discipline, terms and conditions of employment, and termination.

73. Defendants committed these acts with malice, evil motive, or recklessness or callous indifference to Plaintiff's federally protected rights.

74. Defendants' discriminatory conduct caused and continues to cause Plaintiff damages, including lost wages, lost benefits, humiliation, pain, suffering, indignity, inconvenience, emotional distress, reputational harm, and loss of enjoyment of life.

## COUNT TWO
### Retaliation in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981(b)

75. Plaintiff incorporates by reference and re-asserts each of the facts contained in paragraphs 1 through 68 of this Complaint with the same force and vigor as if set out here in full.

76. Plaintiff is black.

77. Plaintiff and Defendants had an employment relationship that is considered contractual under the Civil Rights Act of 1866.

78. Plaintiff reasonably believed that Defendants' conduct was unlawful and discriminatory.

79. Plaintiff engaged in protected activity when she complained of Defendants' racially discriminatory conduct and retaliatory behavior.

80. Defendants took adverse employment actions against her, including acting with hostility, continuing to discriminate, imposing unfounded discipline, and termination.

81. Defendants took adverse employment actions against Plaintiff because of Plaintiff's protected activity.

82. Defendants committed these acts with malice, evil motive, or recklessness or callous indifference to Plaintiff's federally protected rights.

83. Defendants' discriminatory conduct caused and continues to cause Plaintiff damages, including lost wages, lost benefits, humiliation, pain, suffering, indignity, inconvenience, emotional distress, reputational harm, and loss of enjoyment of life.

## COUNT THREE
### Interference in Violation of the FMLA, 29 U.S.C. § 2601 *et seq.*

84. Plaintiff incorporates by reference and re-asserts each of the facts contained in paragraphs 1 through 68 of this Complaint with the same force and vigor as if set out here in full.

85. Plaintiff had serious health condition and an FMLA-qualifying condition.

86. Defendants interfered with and restrained Plaintiff's exercise of FMLA rights by, *inter alia*, criticizing and discouraging Plaintiff from using such leave and by using the taking of legally protected FMLA leave as a negative factor in employment actions.

87. Plaintiff suffered prejudice as a result of Defendants' interference and restraint of her exercise of FMLA rights, including loss of compensation and benefits and loss of employment.

88. Defendants committed these acts willfully, knowingly, or with a reckless disregard for the matter of whether their conduct was prohibited by the FMLA.

89. Defendants' discriminatory conduct caused and continues to cause Plaintiff damages, including lost wages, lost benefits, humiliation, pain, suffering, indignity, inconvenience, emotional distress, reputational harm, and loss of enjoyment of life.

## COUNT FOUR
### Retaliation in Violation of the FMLA, 29 U.S.C. § 2601 *et seq.*

90. Plaintiff incorporates by reference and re-asserts each of the facts contained in paragraphs 1 through 68 of this Complaint with the same force and vigor as if set out here in full.

91. Plaintiff engaged in protected activity by taking FMLA leave.

92. Defendants took adverse action against Plaintiff, including terminating her.

93. Defendants' adverse actions were causally connected to Plaintiff's protected activity.

94. Defendants committed these acts willfully, knowingly, or with a reckless disregard for the matter of whether their conduct was prohibited by the FMLA.

95. Defendants' discriminatory conduct caused and continues to cause Plaintiff damages, including lost wages, lost benefits, humiliation, pain, suffering, indignity, inconvenience, emotional distress, reputational harm, and loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, the premises considered, Plaintiff Tiara Smith respectfully prays that this Honorable Court:

1. Enter judgment in favor of Plaintiff on each of her claims;

2. Enter judgment against Defendants Bolder Healthcare Solutions and The ROI Companies, jointly and severally, on all counts contained herein;

3. Declare Defendants' conduct in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*;

4. Award Plaintiff damages for all lost compensation and benefits, past and future;

5. Award Plaintiff lost pay and benefits;

6. Award Plaintiff liquidated damages;

7. Award Plaintiff compensatory damages in an amount to be determined by a jury;

8. Award Plaintiff punitive damages in an amount to be determined by a jury;

9. Award Plaintiff reasonable attorneys' fees, costs, and expenses;

10. Award Plaintiff pre-judgment interest and post-judgment interest; and

11. Grant such other relief as this Court deems just and proper.

Dated: April 24, 2020                                CORREIA & PUTH, PLLC


                                                    　　　 */s/ Jonathan C. Puth*　　　　
                                                    Jonathan C. Puth (Bar No. 15131)
                                                    1400 16th Street, NW, Suite 450
                                                    Washington, DC 20036
                                                    (202) 602-6500 (tel)
                                                    (202) 602-6501 (fax)
                                                    jputh@correiaputh.com

                                                    *Counsel for Plaintiff Tiara Smith*

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands trial by jury on all issues contained herein.

Dated:  April 24, 2020                                CORREIA & PUTH, PLLC


                                               */s/ Jonathan C. Puth*
Jonathan C. Puth (Bar No. 15131)
1400 16th Street, NW, Suite 450
Washington, DC 20036
(202) 602-6500 (tel)
(202) 602-6501 (fax)
jputh@correiaputh.com

**VERIFICATION**

I, Tiara Smith, declare under penalty of perjury that I have read the foregoing Complaint and that it is true to the best of my knowledge, information, and belief.

_____
Tiara Smith