## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TIARA SMITH                                    *

                                               *

v.                                             *          Civil Action No.  20-cv-1062

                                               *

BHS HOSPITAL SERVICES INC., *et al.*

                                               *

\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM

Pending before the court is a four-count employment discrimination and retaliation complaint filed by plaintiff Tiara Smith against defendants BHS Hospital Services, Inc. and Receivables Outsourcing, LLC. The defendants have filed a motion for summary judgement as well as two motions to strike two of the plaintiff's exhibits to her response in opposition to the summary judgment motion. The motions are fully briefed, and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, the court will grant in part and deny in part the motion for summary judgment and deny both motions to strike.

### BACKGROUND

Hiring, Company Policies, and Inbound Collector Responsibilities

On February 10, 2014, Ms. Tiara Smith, a black woman, began working for defendant Receivables Outsourcing, LLC ("RO") as an inbound bad-debt collector at their Collections Department in Timonium, Maryland. (ECF 45, Ex. 3, at ECF 46, Smith Personnel Action Form).

In 2015, BHS Hospital Services, Inc., doing business as Bolder Healthcare Solutions ("BHS"), acquired RO and continued to operate RO's debt collection services under RO's name. (ECF 45-2, Ex. 1, Ripke Dep., 15:15-20; ECF 8, Answer, ¶ 11). BHS and RO jointly employed

1

Ms. Smith. They have policies providing equal opportunities for and treatment of all employees regardless of race (ECF 46-2, Ex. 5, RO Employee Handbook, at BHS 8), and adhering to Family and Medical Leave Act ("FMLA") requirements to provide family and medical leave to qualifying employees (*id.* at BHS 36-40). BHS and RO additionally provide a "Standards and Conduct" policy which outlines conduct expectations for employees and the potential consequences of unsatisfactory performance. (*Id.* at BHS 15-16). There is also a confidentiality policy in place to protect Personal Identifying Information under the Health Insurance Portability and Accounting Act ("HIPAA"). (*Id.* at BHS 32-33).

In her role as an inbound collector, Ms. Smith earned bonuses, commissions, and cash awards based on the revenue she generated over pre-set monthly quotas known as her "budget." (ECF 50-9, Ex. 9, Woodall Dep., 84:1-86:8; ECF 50-10, Ex. 10, Ripke Dep., 35:17-36:15).

<u>Ms. Smith's Job Performance and Promotion</u>

The parties dispute Ms. Smith's success as an employee at RO. The defendants note that Ms. Smith was disciplined three times in 2014 and 2015 for unauthorized internet use, failing to ask clients for alternate phone numbers, and incorrect follow-up on a payment issue. (ECF 45-13, Ex. 12, June 9, 2014, Corrective Action; ECF 45-14, Ex. 13, Aug. 18, 2015, Corrective Action; ECF 45-15, Ex. 14, Dec. 9, 2014, Corrective Action). At some point after these incidents, Ms. Smith requested to be transferred to the "self-pay" division, where Anita Shaffer served as her Team Leader ("Lead") and Martin Woodall was Client Manager, another supervisor. (ECF 45-8, Ex. 7, Smith Dep., at 101:12-23). In April 2016, Ms. Shaffer reported that Ms. Smith made a rude comment to her and failed to complete a project priority that she was assigned, for which Ms. Shaffer recommended corrective action be taken. (ECF 45-16, Ex. 15, Shaffer Email (Apr. 13, 2017)).

2

Ms. Smith, who was promoted to senior collector, contends that she excelled at her job, citing her June 2016 performance appraisal, where Mr. Woodall and her then-Team Lead Kris Brake found that she met or exceeded every RO performance measure. (ECF 52-6, Ex. 11, June 2016 Smith Performance). They praised Smith for "consistently" exceeding her budget, with a "friendly phone demeanor, and a solid cash collection approach," giving her an overall rating of "Exceeds" performance standards, although they also identified several areas that needed improvement. (ECF 52-6 at 2-3). In November 2016, her new Team Lead Anita Shaffer gave Ms. Smith a 4 out of 5 review without comment, in connection with a potential staff reduction, higher than approximately half of all employees reviewed. (ECF 52-10, Ex. 18, Shaffer Staff Reduction Email (Nov. 22, 2016)). Ms. Smith exceeded her budget in ten of twelve months in 2016 and in all four months in 2017 during which she was employed by the defendants. (ECF 52-7, Ex. 12, Smith 2016 Collector Scorecard; ECF 52-9, Ex. 14, Smith 2017 Collector Scorecard).

FMLA Leave

In June 2016, Ms. Smith applied for and received intermittent unpaid FMLA leave for anxiety that could be triggered as a result of her choice to stop taking her prescribed medication. (ECF 50-1 at 154:1-158:6). Ms. Smith first took FMLA leave in September 2016, which typically would entail late arrivals or brief breaks from work. (*Id.* at 159:18-25, 160:8-25, 162:17-163:22, 179:7-180:2). When she requested medical leave, Ms. Smith would send an e-mail or text a Team Lead to inform her supervisor that she would be using FMLA leave. (*Id.* at 160:8-25). In response, her Team Lead would typically respond with "okay" or "feel better." (*Id.*) Ms. Smith was never prohibited from taking intermittent FMLA leave when she requested to do so. (*Id.*)

Assignment of Calls to Senior Collectors

3

RO's Senior collectors made calls from a pre-assigned queue of accounts. (ECF 50-15, Ex. 15, Shaffer Dep., at 17:21-19:4). As accounts varied in value, RO assigned them "as fair[ly] as possible by going by alpha split," where the IT department assigned each senior collector a portion of the alphabet to work what should include an approximately random distribution of accounts of varying values. (*Id.* at 17:21-19:4, 20:1-22:8). Additionally, each week, senior collectors were assigned a list of valuable "high dollar accounts" or "high dollar reports," also assigned by alpha split. (ECF 50-16, Ex. 16, Hunt Dep., at 38:18-40:20; ECF 50-1 at 209:22-210:3; ECF 50-15 at 107:4-7). High dollar accounts were scored as easier to collect than other accounts and created more opportunity for senior collectors to earn commissions by generating revenue above their monthly budget. (ECF 50-15 at 37:9-38:7; ECF 50-16 at 39:4-17). As the high dollar accounts were time sensitive, they were assigned manually, occasionally resulting in errors in assignment. (ECF 45-10, Ex. 9, Shaffer Dep., at 54:17-55:3, 56:3-5; ECF 45-3, Ex. 2, Woodall Dep., at 171:12-172:16). Such accounts also were reassigned for various reasons, including meeting client deadlines. (ECF 45-3 at 158:12-159:1).

Alleged Discrimination

### First Complaint (December 2016 - January 2017)

Ms. Smith claims that she became aware in December 2016 that Ms. Hunt had transferred some of her high dollar collection opportunities from the pre-assigned alpha split to Jennifer Sizemore, a white collector. (ECF 50-1 at 148:24-149:6, 220:2-8). Similar transfers allegedly resulted in white senior collectors Sizemore, Marc Goodman, Nicole Villa, and Laura Maloon receiving more valuable opportunities than Ms. Smith and Ms. McGill Watkins, the only other black senior collector working under Ms. Hunt. (ECF 50-1 at 196:2-19; 218:4-221:13). Despite receiving more high- and extremely-high-value accounts to work than Ms. Smith, Ms. Sizemore

4

and Ms. Maloon received lower performance scores and more frequently missed their budgets than Ms. Smith in 2016. (ECF 50-1, at 203:25-204:06, 219:10-22; ECF 52-10, Ex 18; ECF 52-11, Ex. 19, Sizemore Scorecard; ECF 52-12, Ex. 20, Maloon 2016 Scorecard; Ex. 9 at 104:6-21).

Ms. Smith raised a complaint regarding this alleged discrimination with Ms. Hunt and Mr. Woodall on December 21, 2016, telling him that "there was bias in the way that the work queues had been assigned." (ECF 50-1 at 201:13-25; ECF 50-21, Ex. 21, Woodall Email to Smith (Dec. 21, 2016)). Specifically, Ms. Smith argued that Ms. Hunt took accounts that were assigned to her in the alpha split and reassigned them to her white coworkers, including Ms. Sizemore, Ms. Maloon, and Mr. Goodman, and that the dollar values of the accounts that remained assigned to her were several orders of magnitude smaller than those assigned to white coworkers. (ECF 50-1 at 196:5-25, 201:15-205:24; ECF 50-2, Ex. 2, Plaintiff's Answers to Interrogs., at 12-13). Additionally, Ms. Smith asserted that the white senior collectors were given smaller budgets than herself and Ms. McGill Watkins, making it even harder for her to earn commission in any given month. (*See* ECF 50-1 at 218:4-219:22; *compare* ECF 52-7, Ex. 12 (Ms. Smith's $13,000 December budget) *with* ECF 52-11, Ex. 19 (Ms. Sizemore's $10,000 December budget)).*and* ECF 52-12, Ex. 20 (Ms. Maloon's $6,500 December budget)).

Mr. Woodall responded by telling Ms. Smith she had some valid points and asking if her FMLA leave could contribute to any challenges she had making her budget. (ECF 50-1 at 205:4-206:21). Ms. Smith denied that her taking leave impacted her performance, and Mr. Woodall did not raise the issue again. (*Id.*). In a subsequent email exchange with Ms. Smith, Mr. Woodall promised to "right the ship" and to follow up the next week. (ECF 50-22, Ex. 22, Woodall Email to Smith (Dec. 22, 2016)). Mr. Woodall did not follow up with Ms. Smith again (ECF 52-14 Ex. 24, Woodall Email to Smith (Jan. 6, 2017)), but rather emailed Ms. Hunt regarding Ms. Smith's

complaint (ECF 52-13, Ex. 23, Woodall Email to Hunt (Jan. 17, 2017)). Ms. Smith spoke to Ms. Hunt directly with her concern that she did not meet her budget in December, and she replied that Ms. Smith was doing nothing wrong. (ECF 50-1 at 234:12-25).

Ms. Smith followed up with Mr. Woodall about her discrimination complaint on January 18, 2017. (ECF 50-1 at 234:21-235:9; ECF 52-2, Ex. 5, Smith Email to Woodall (Jan. 18, 2016); ECF 52-15, Ex. 25, Woodall Email to Smith (Jan. 18, 2016)). In response, Mr. Woodall identified examples of "missing money" that he wished to discuss with Ms. Smith. (ECF 50-1 at 235:10-18; ECF 52-2). When Ms. Smith asked Ms. Hunt about this money she was failing to collect, Ms. Hunt replied, "I don't know what he's talking about." (ECF 50-1 at 235:19-236:15, 237:8-238:3).

The defendants contend that during the timeframe of the alleged discrimination, Ms. Smith's performance deteriorated. Sometime after Ms. Smith became a senior collector, Melody Hunt, a white senior collector, was promoted to Ms. Smith's Team Lead, replacing Kris Brake. (ECF 50-1 at 210:17-211:1). After Ms. Smith notified Mr. Woodall that she was having trouble meeting her monthly budget, he responded by identifying four accounts where Ms. Smith overlooked recoverable debts. (ECF 46-4, Ex. 17, Hunt Email to Woodall (June 22, 2016)). A series of emails indicates that supervisors identified other errors in coding calls and requesting payments that Ms. Smith made in her new role as senior collector which cost RO potential funds, and Ms. Smith's June Report noted that she could improve the way she worked accounts to maximize productivity. (ECF 45-20, Ex. 19; ECF 46-5, Ex. 18, Various Smith Emails). Ms. Smith's supervisors continued to identify issues and offer her coaching and advice about how to improve collections at various points during the remainder of her employment at RO. (ECF 45-9, Ex. 8, Hunt Dep., at 83:21-84:21, 86:12-88:11; ECF 45-3 at 138:5-21, 149:2-19, 177:17-181:18;

ECF 46-4, Ex. 17, Woodall Email to Hunt (June 22, 2016); 46-7, Ex. 21, Various Emails from Jan. to Apr. 2017).

### Complaint to Human Resources and Suspension (February 2017)

In early February 2017, Ms. Smith complained of Ms. Hunt's allegedly discriminatory allocation of high dollar accounts to Human Resources Director Grant Wunder, which he in turn discussed with RO's Human Resources Department Director Courtney Rudinoff. (ECF 50-3, Ex. 3, Wunder Dep., at 73:21-74:6, 75:3-76:13, 84:4-17, 87:16-88:15; *see also* ECF 52-1, Ex. 4, Wunder Email to Smith (Mar. 31, 2017)). After speaking with Ms. Hunt, Mr. Woodall, Ms. Rudinoff, and possibly Ms. Shaffer, Mr. Wunder concluded that Ms. Smith's claims were unsubstantiated. (ECF 45-29, Ex. 28, Wunder Dep., at 79:9-83:10, 85:5-87:20, 90:18-93:6, 99:13-16).

At some point in the days immediately after Ms. Smith's complaint to Mr. Wunder, Ms. Smith and Ms. McGill Watkins saw and reviewed a high dollar account list assigned to Ms. Villas that they found on her desk. (ECF 45-9 at 74:1-20, 76:16-22). Because the list contained personal identifying information to which Ms. Smith was not privy, RO placed both Ms. Smith and Ms. McGill Watkins on a three-day suspension for viewing Ms. Villas's list. (ECF 45-8 at 194:6-25, 197:5-8). Ms. Smith asserts that she did not know that looking at a coworker's high dollar sheet was improper, as collectors routinely reviewed each other's reports and she had been tasked with handing out such reports to her coworkers. (ECF 50-1 at 194:4-196:1, 242:4-15; ECF 50-2 at 14). Ms. Shaffer also expressed surprise over the suspensions, as it was the first time she could recall that an employee had ever been suspended for any reason from when she began working at RO in 2013 through the time of her deposition in 2021. (ECF 50-15 at 48:10-17).

Escalating Workplace Tension and Renewed Discrimination Complaint (March 2017)

Following her suspension, Ms. Smith returned to work at RO and experienced interpersonal conflict with her supervisors. On March 21, 2017, when Ms. Smith sought clarification from Ms. Hunt regarding a work matter, Ms. Hunt loudly replied, "What!? I already answered your question! Jesus Christ!" (ECF 50-2 at 15). After meeting, Ms. Smith e-mailed Ms. Hunt and requested that she "address her respectfully" in future interactions. (*Id.*; ECF 45-31, Ex. 30, Woodall Email to Smith (Mar. 21, 2017)). This email prompted Ms. Rudinoff to email Ms. Smith directly and asked her to come discuss her e-mail. (ECF 45-32, Ex. 31, Rudinoff Email to Smith (Mar. 21, 2017)). On March 30, 2017, Mr. Woodall discovered errors in an account Ms. Smith worked, and spoke with her directly about his concerns without involving Ms. Hunt. (ECF 46-7, Ex. 21, Woodall Email to Smith (Mar. 31, 2017), at 9).

Ms. Smith additionally took issue with Ms. Hunt's choice, at some point after her discrimination complaint to Human Resources, to reassign her desk to sit in-between two loud employees who would "talk, laugh, [and] sing" all day. (ECF 50-1 at 241:12-241:23; ECF 52-18, Ex. 29, Smith Email to Shaffer (Apr. 13, 2017)). Eventually, after another request from Ms. Smith in April, Mr. Woodall noted that "upper management has noticed this . . . issue and it needs to stop." (ECF 52-19, Ex. 30, Woodall Email to Shaffer (Apr. 13, 2017)).

On March 31, 2017, Ms. Smith again complained to Mr. Wunder that she was being discriminated and retaliated against for reporting this discrimination. (ECF 52-1). Specifically, Ms. Smith asserted that she had experienced hostility from her supervisors, that her unusually low revenue collection in December and January was due to bias, and reminded Mr. Wunder that she had heard no response regarding her February discrimination complaint. (*Id.*). Immediately after Ms. Smith sent this email, Ms. Hunt sent Mr. Wunder examples of accounts that Ms. Smith

"worked incorrectly." (ECF 52-20, Ex. 31, Hunt Email to Wunder (Mar. 31, 2017), at 2). Mr. Wunder replied to Ms. Smith's email, stating that he believed the allegations of discrimination to be resolved and that a comprehensive investigation revealed no discrimination to have occurred. (ECF 52-1).

### Performance Review, Meeting with Ms. Shaffer, and Termination (April 2017)

On April 18, 2017, Ms. Smith met with Ms. Hunt, Ms. Rudinoff, and Mr. Woodall to review Ms. Smith's performance. (*See* ECF 52-4, Ex. 7, Smith Month-End Scorecard). As stated above, Ms. Smith exceeded her budget in the first three months of 2017. (*Id.*). Ms. Smith had also earned praise for her work from her Team Lead, Ms. Shaffer, for her work on April 3, 2017. (ECF 52-8, Ex. 13, Shaffer Team Email (Apr. 3, 2017)). At the meeting, Mr. Woodall again claimed that Ms. Smith had missed collectable money, but refused to provide the account in question for Ms. Smith to review. (ECF 50-1 at 255:25-257:1). After Ms. Smith raised her discrimination complaint again, Ms. Rudinoff responded, stating "your accusations regarding discrimination are false." (*Id.* at 257:1-6.). That same day, Ms. Smith also sent an email to Mr. Woodall, contending that Cathy Derricks, another black collector, received credit for an account originally assigned to Ms. Smith. (ECF 46-12, Ex. 34, Smith Email to Woodall (Apr. 18, 2017)).

On April 26, 2017, Ms. Smith met with Ms. Shaffer for approximately two hours to raise her discrimination concerns regarding Ms. Hunt moving the high dollar accounts from her to white senior collectors. (ECF 50-15 at 58:13-21; *see also* ECF 50-1 at 188:3-189:25). Ms. Shaffer promised to do what she could to help Ms. Smith, and assured her, "you do a good job." (ECF 50-15 at 58:13-59:10, 62:18-21). Ms. Smith shared two examples of high dollar accounts that should have been hers but were reassigned, and Ms. Shaffer agreed that they should have been given to Ms. Smith and stated that there should not have been two mistakes in allocation within two weeks.

(*Id.* at 54:4-14; ECF 50-32, Ex. 32, Smith Email to Shaffer (Apr. 26, 2017)). Ms. Shaffer confronted Ms. Hunt about the accounts, and Ms. Hunt stated the reassignment was an accident. (ECF 50-15 at 56:11-20).

After Ms. Smith's meeting with Ms. Shaffer concluded, Mr. Wunder and Ms. Rudinoff called her into a second meeting where her employment was terminated. (ECF 50-15 at 73:2-75:13). The next day, on April 27, 2017, Ms. Hunt drafted a form formalizing Ms. Smith's termination for "unsatisfactory performance." (ECF 52-21, Ex. 34, Hunt Email to Wunder et al. (Apr. 27, 2017)). Over the final days of her employment at RO, Ms. Smith rarely worked the ten-account-per-hour minimum per RO's standard. (ECF 45-34, Ex. 33, RO User Productivity Report for Smith (Apr. 17-25, 2017)). Ms. Hunt and Mr. Woodall stated that, prior to her termination, Ms. Smith struggled to focus and be productive throughout the day, and did not demonstrate the competence required for her position. (ECF 45-9 at 83:20-84:9, 86:12-88:3; ECF 45-3 at 177:17-179:21, 213:3-22). After Ms. Rudinoff terminated Ms. Smith, Ms. Shaffer noted that Ms. Rudinoff was visibly upset, chain smoking and saying repeatedly, "I have had enough. I'm over it." (ECF 50-15 at 74:10-76:10).

When she was notified that Ms. Rudinoff and Mr. Wunder made the decision to terminate Ms. Smith for productivity concerns, Ms. Shaffer was surprised, as Ms. Smith consistently met her budget. (*Id.* at 63:3-6, 66:20-22). Ms. Shaffer stated that part of the reason Ms. Smith failed to meet the ten account per hour metric could have been their two-and-a-half-hour meeting that day. (*Id.* at 64:19-66:1).

Procedural History

On October 11, 2017, Ms. Smith filed a charge with the EEOC alleging discrimination. (ECF 50-35, Ex. 35, EEOC Charge). In March 2019, the EEOC found reasonable cause to believe

that Ms. Smith was fired in retaliation for her complaints of discrimination. (ECF 50-36, Ex. 36, Rhodes EEOC Determination (March 12, 2019)).

Ms. Smith filed her present complaint on April 24, 2020. (ECF 1, Compl.). The defendants moved for summary judgment on September 23, 2021 (ECF 45, Mot. for Summ. J.), to which Ms. Smith responded (ECF 50, Opp'n), and the defendants replied (ECF 56, Reply). The defendants additionally moved to strike (1) Ms. Smith's declaration (ECF 57, Mot. to Strike I) and (2) the EEOC's finding (ECF 58, Mot. to Strike II) on November 22, 2021, to which Ms. Smith responded (ECFs 60, 61) and the defendants replied (ECFs 62, 63).[1]

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C.*

---

[1] Ms. Smith has also moved for sanctions against the defendants. (ECF 65). Because the requested sanctions would be applicable at trial, and not in connection with this motion for summary judgment, the motion for sanctions will be denied without prejudice at this time.

11

*Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). The relevant inquiry is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

## DISCUSSION

For each of Ms. Smith's four claims, the court is tasked with determining whether a genuine dispute as to any material fact exists that entitles the plaintiff to proceed to trial. Fed. R. Civ. P. 56(a). For the reasons explained below, summary judgment will be denied as to the claims of discrimination and retaliation under 42 U.S.C. § 1981, but granted as to the FMLA claims.

### I.   *McDonnell-Douglas* Burden Shifting

There are two approaches plaintiffs may take to prove a § 1981 or FMLA violation. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (employing the burden-shifting framework for § 1981 claims); *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006). ("FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework"). The first approach is to offer direct evidence of discrimination under ordinary principles of proof. *Guessous*, 828 F.3d at 216. Where there is no direct evidence of intentional discrimination, a plaintiff may proceed with disparate treatment claims under the second method: the burden-shifting approach described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Under this framework,

> (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory.

*Id.* Here, Ms. Smith offers no direct proof of discrimination;[2] so the court will examine her claims under the burden-shifting framework.

## II.   Count I: Racial Discrimination in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981(b)

Ms. Smith's first claim is that the defendants unlawfully discriminated against her on the basis of race in violation of 42 U.S.C. § 1981. A race discrimination claim under § 1981 requires the plaintiff to prove that "(1) [she] is a member of a protected class; (2) [she] was qualified for the job and [her] performance was satisfactory; (3) in spite of [her] qualifications and performance, [she]suffered adverse employment action; and (4) [she] was treated differently from similarly situated employees." *Qualls v. Giant Food, Inc.*, 187 F. Supp. 2d 530, 533 (D. Md. 2002).

For this claim to survive the defendants' motion for summary judgment, Ms. Smith must demonstrate that there is, at minimum, a genuine dispute of material fact as to each of the listed elements. The defendants do not dispute that Ms. Smith, as a black woman, is a member of a protected class, nor that she suffered adverse employment actions when she was suspended and when her employment was terminated. They do, however, argue that (1) Ms. Smith's performance was unsatisfactory, and (2) that she was not treated differently from similarly situated white employees, thus the circumstances surrounding the adverse actions do not give rise to an inference of discrimination. The court will address each argument in turn.

---

[2] While Ms. Smith states that Ms. Woodall explicitly asked whether her use of FMLA leave contributed to her difficulty making her monthly budget, such a question without repetition or other indication of discriminatory intent fails to rise to the level of direct proof of discrimination.

A. Ms. Smith's Performance

The defendants first contend that Ms. Smith has not supported her prima facie case for race discrimination because she cannot show that she was meeting RO's reasonable expectations for her performance when they terminated her employment. The defendants offer as proof of Ms. Smith's inadequate performance evidence that she occasionally failed to make her budgets when she was hired in 2014 (ECF 45-8 at 127:10-128:13) and immediately after being promoted to Senior Collector (ECF 46-6, Ex. 20, Smith Email to Woodall (July 7, 2016)), a number of emails pointing out mistakes in her work (ECF 46-4; ECF 46-7 at 5, 12-13, 22), and statistical analysis indicating that, beginning in mid-2016, Ms. Smith's interactions with accounts decreased relative to her coworkers and her own previous rate of work (ECF 56-3, Ex. C, Dr. Bronar Expert Report). Additionally, the defendants note that Ms. Smith's productivity, as measured by accounts she engaged in per hour, flagged during her final week at RO in April 2017. (ECF 45-34).

In response, Ms. Smith identifies a number of documents which demonstrate RO was consistently satisfied with her performance. In her June 2016 performance appraisal, Ms. Smith "exceed[ed]" overall expectations and met or exceeded every performance metric listed. (ECF 52-6; ECF 50-1 at 140:23-25). Later that month, she was promoted to senior collector. (ECF 45-8 at 109:24-25). In November 2016, Ms. Shaffer gave Ms. Smith an above-average 4 out of 5 review in regard to other collectors. (ECF 52-10). Ms. Smith exceeded her budget in ten of twelve months in 2016 and in all four months in 2017 during which she was employed by the defendants. (ECF 52-7; ECF 52-9). What trouble she had making budget, Ms. Smith attributes to the defendants' alleged discrimination against her in restricting the appropriate number of high dollar accounts given to her. Such "indicators of overall satisfactory performance" as reviews and routinely meeting or exceeding monthly revenue generation goals, satisfy a plaintiff's "minimal burden of

14

showing satisfactory performance for purposes of summary judgment." *See Glunt v. GES Exposition Servs.*, 123 F. Supp. 2d 847, 865 (D. Md. 2000).

At the summary judgment stage, it is not the role of the court to "weigh evidence or make credibility determinations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). Viewed in the light most favorable to the plaintiff, Ms. Smith provides evidence of strong performance as a revenue generating senior collector throughout 2016 and 2017. The defendants' record of Ms. Smith's errors and intra-office disputes demonstrates that a genuine dispute exists as to whether Ms. Smith was meeting RO's performance standards, but Ms. Smith has  supported the second element of her § 1981 discrimination claim sufficiently to survive summary judgment.

### B.  Treatment of Ms. Smith Versus Comparator Employees

To meet the evidentiary burden of supporting the fourth element of her claim, Ms. Smith offers several white senior collector co-workers as comparator employees; among them Mr. Goodman, Ms. Sizemore, Ms. Villa, and Ms. Maloon. First, Ms. Smith offers evidence that white senior collectors were assigned lower, and thus easier to meet, budgets than herself and Ms. Watkins, the other black collector on her team. (*Compare* ECFs 52-7 and 52-9 (Smith's Scorecards) *with* ECFs 52-11, Ex. 19, Sizemore Scorecard and 52-12, Ex. 20, Maloon Scorecard). In at least one month, January 2017, Ms. Smith's budget was double the size of that of Ms. Maloon: $13,000 versus $6,500. (*Compare* ECF 52-9 *with* ECF 52-12). Additionally, comparator employees often failed to make budget and were not fired because of their lack of productivity. (*See* ECF 52-12 (Ms. Maloon did not make budget two months in a row in 2016 and was retained)). Finally, Ms. Smith provides emails from Ms. Shaffer where Ms. Shaffer comments that Ms. Hunt, probably by mistake, incorrectly assigned high value and high dollar accounts to Ms. Smith that

had already been worked instead of by the proper alpha split. (ECF 50-15 at 54:4-56:10; ECF 50-32; ECF 50-33, Ex. 33, Shaffer Email to Smith (Apr. 26, 2017)). Each of these differences in treatment, in combination with her own testimony at deposition regarding the inequitable manual ·assignment of accounts (*see* ECF 50-1 at 196:5-25 (accounts with hundreds of thousands of dollars of debt are only given to white employees), 202:10-204:21 (explaining her knowledge of her white coworkers' large account assignments), 217:25-219:22 (explaining how her queue was more difficult to make budget with than those of her white coworkers)) serves to support Ms. Smith's argument that she was treated differently than white employees.

### C. *McDonnell-Douglas* Analysis

Having met the burden of establishing a prima facie case for each of the four elements, Ms. Smith has provided evidence sufficient for a jury to infer that the defendants discriminated against her because of her race. Because the defendants have proffered a non-discriminatory reason for firing Ms. Smith – her poor job performance – the court must consider under the *McDonnell-Douglas* framework whether Ms. Smith has proffered evidence that the stated reason for the adverse employment action is a pretext for discrimination.

The defendants' evidence of Ms. Smith's poor performance has been explored by the court, *see § I.A, supra*, and demonstrates that team leaders and supervisors at RO appear to have been, at times, displeased by Ms. Smith's work product, and that her engagement with accounts per hour from December 2016 to April 2017 decreased by approximately 30 percent relative to her rate prior to December 2016 (*see* ECF 56-3 at 8-9). In response, Ms. Smith offers evidence that her performance was more than adequate throughout her tenure at RO.[3]

---

[3] The defendants note that one coworker Ms. Smith alleged received better high dollar accounts was also black (Ms. Cathy Derricks). They do not, however, provide any caselaw which would require that the plaintiff prove that no other

First, any employees, especially those who transitioned to a new role within the same year, may be expected to learn on the job and require training and mentorship from their supervisors. While some of the defendants' emails are evidence of failures by Ms. Smith to meet expectations, Ms. Smith contends that some such email exchanges are not factually accurate and were used to "paper" Ms. Smith's record to obfuscate any discriminatory reason for her termination. (*See* ECF 50 at 4, *see also* ECF 52-2 (Mr. Woodall notes Ms. Smith "missed [opportunities to collect] insurance money" from some accounts, but does not provide specific examples).

Second, Ms. Smith contends that the accounts per hour metric was not actually used or valued by RO.[4] Accepting *arguendo* the use of the metric by RO to evaluate performance, Ms. Smith notes that for each month from January to March 2017,[5] she worked an average of ten and two thirds accounts an hour, meeting or exceeding the purported ten accounts per hour metric each month and not engaging accounts more or less frequently than other senior collectors Goodman, Sizemore, or Turner. (*Compare* ECF 52-9, Smith (10 or 11 accounts/hour each month), *with* ECF 52-27, Sizemore (10 or 11 accounts/hour); ECF 52-30; Turner (10 or 11 accounts/hour for four months, falling to 9 accounts per hour in January and February 2017); *and* ECF 52-31, Goodman (9-16 accounts/hour); *but see* ECF 52-28, Maloon (12-16 accounts/hour)).[6] By their own purported metric, RO fails to convincingly demonstrate an appreciable decrease in Ms. Smith's account

---

members of her racial group received better treatment. Such evidence, if admissible, may be weighed and considered by a jury, but does not defeat Ms. Smith's claims at this stage in litigation.

[4] The defendants purport to provide deposition testimony by Ms. Rudinoff, however, that in late 2016, Regional Vice President Jason Ripke instructed management to address collectors who fell below ten account touches per hour and encouraged them to manage out individuals who could not meet that standard. The page detailing this testimony in the attached exhibit, however, appears not to have properly attached to the filing. (*See* ECF 56-4, Ex. D, Beitle (Rudinoff) Deposition (incomplete)).

[5] Total hours worked for April are not available, so the month is not included in this average. (*See* ECF 52-9).

[6] Other senior collectors' averages include engagement with accounts per hour from January to June 2017.

engagement or absolute levels of engagement below comparator employees. Collectors' ability to make their budgets appears to be at the heart of BHS and RO's business model; to turn a profit, their collectors must meet or exceed monthly revenue-generating standards, which Ms. Smith consistently did throughout her tenure as a senior collector and every month that she worked in 2017 until April.

Third, the defendants' report must be weighed against the plaintiff's own expert's testimony. Ms. Smith offers an expert report in support of her own productivity in May 2016 through April 2017, which concludes that: "Ms. Smith's collections were higher than 70 percent of peers [other senior collectors]. [Her] monthly collection goal was higher than 75 percent of peers. [Her] commission was higher than 55 percent of peers and [she] met her monthly budget more often than 60 percent of her peers." (ECF 50-40, Ex. 40, Dr. Kaufmann Expert Report, at 8).[7]

Fourth, Ms. Smith contends that the defendants departed from their progressive discipline procedure as stated in their employee handbook. (ECF 52-29, Ex. 46, RO Handbook, at 16-18 ("[A]ll corrective action administered will be documented in writing and filed in the associate's personnel file. . . [c]orrective action, even for different types of infractions, will be regarded as progressive in nature . . .")). With respect to Ms. Smith's three-day suspension, RO contends that the punishment was both progressive discipline and warranted for the HIPAA privacy violation Ms. Smith committed by looking at Ms. Villa's assignment. Ms. Smith, however, notes that she was routinely required as part of her job to distribute such lists, and that it was common practice to compare lists with coworkers.

---

[7] This report includes additional analysis comparing the commission made by black and non-black senior collectors with at least one year's experience, either under the supervision of Ms. Hunt or under another supervisor. (*Id.* at 5-7). Because, however, there were only six senior collectors, four white and two black, working under Ms. Hunt during the relevant period, the sample sizes render such conclusions unhelpful to the court.

Ms. Smith additionally contends that white senior collectors who had committed similar or worse infractions had previously received lesser corrective action. She notes that, in February 2016, Mr. Woodall had written up Mr. Goodman for "scrolling through" the defendants' electronic patient account data that was not assigned to him and which he had no authority to review, and for having account entries that included false information. (ECF 52-24, Ex. 29, Infraction Records, at 14). Despite having already received a similar warning for a similar infraction a year earlier, Mr. Goodman was given a warning without suspension for his actions. (*Id.*). This difference in type and quantity of punishment for Mr. Goodman and Ms. Smith's similar policy violations could support an inference that the defendants' stated reason for this adverse action was pretextual. Similarly, the defendants' choice not to fire other senior collectors who failed to make their budgets multiple months in a row (*see, e.g.*, ECF 52-11 (Ms. Sizemore failed to make her budget multiple times and, instead of being terminated, was transferred to become an inbound collector (*see* ECF 50-9 at 116:22-117:18))) also suggests the defendants' stated reason for Ms. Smith's termination was pretextual.

Finally, the timing of Ms. Smith's termination itself, mere minutes after she raised her concerns of discrimination in a meeting with Ms. Shaffer on April 26, 2017, and just eight days after she renewed her formal discrimination complaint with human resources, is evidence that the defendants' proffered concerns with productivity may be pretextual. *See Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (holding the termination of an employee hours after she complained of harassment was evidence of pretext). The timing of Ms. Smith's suspension, coming just days after she submitted her formal complaint of discrimination to Mr. Wunder, additionally suggests that the defendants' proffered reasons for that adverse action also were pretextual.

19

The weight of the evidence, circumstantial and otherwise, which must be looked at most favorably to Ms. Smith, is sufficient to support the position that concerns about her productivity were pretextual reasons for her termination. Summary judgment will be denied with respect to Count I.

### III.   Count II: Retaliation in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981(b)

While rarely used as a vehicle for such claims, 42 U.S.C. § 1981, as amended, has been held to permit retaliatory discharge claims. *See, e.g.*, *Williams v. Carrier Corp*, 889 F. Supp. 1528, 1530 (M.D. Ga. 1995), *aff'd*, 130 F.3d 444 (11th Cir. 1997) ("[T]his court must conclude that a retaliatory discharge claim is cognizable under § 1981 as it presently exists"). To establish a prima facie case of retaliation, a plaintiff must prove (1) that she engaged in protected activity, (2) that her employer took an adverse action against her, and (3) that there was a causal link between the two events. *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).

The first two elements are easily met. Ms. Smith has provided substantial proof that she engaged in protected activity on numerous occasions: first by complaining of discrimination to her supervisors on December 21, 2016; next by following up with Mr. Woodall on January 18, 2017; then again in February 2017 by formally complaining to Mr. Wunder in Human Resources; then on March 31, 2017, by following up with Mr. Wunder and explicitly complaining of perceived retaliation; then on April 18, 2017, when Ms. Smith raised her discrimination complaint again during her performance evaluation, and finally on April 26, 2017, by raising her concerns in her meeting with Ms. Shaffer immediately before she was terminated. (*See* Background, *supra*). It is undisputed that the defendants took at least two adverse actions against Ms. Smith: suspension and termination.

The third and final element of causation also is supported by evidence proffered by Ms. Smith. Ms. Smith documents more than one occasion where her supervisors responded with hostility when discussing her race discrimination complaints. These include Ms. Hunt yelling at Ms. Smith in public shortly after she returned from her suspension (ECF 50-2 at 15) and Ms. Rudinoff "yelling" that Ms. Smith's "accusations of discrimination are false" during her final performance review. (ECF 50-1 at 257:1-6). Additionally, the evidence that suspension and termination were not typical corrective actions for the type of misconduct Ms. Smith is alleged to have committed is suggestive of a causal link between her complaints of discrimination and the adverse actions. Lastly, the temporal proximity of Ms. Smith's termination, taking place a week after renewing her complaint of discrimination, is sufficient to establish causation. *See Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 253 (4th Cir. 2015) (*citing King v. Rumsfeld*, 328 F.3d 145, 151 & n. 5 (4th Cir. 2003)) (holding that the passage of a month between a complaint of retaliation and the adverse employment action is sufficiently narrow to establish the causation prong of a prima facie retaliation case).

Because Ms. Smith adequately supported a prima facie case of retaliation under the statute, and the defendants contend that the adverse actions they took were not retaliatory, but rather in response to Ms. Smith violating workplace policy and failing to perform her duties adequately, the *McDonnell-Douglas* burden-shifting framework applies. All evidence of pretext explored in Count I applies equally with respect to Count II, and, looked at most favorably to Ms. Smith, again supports her position that the defendants' stated reasons for the adverse employment actions were pretext for a retaliatory motive. Summary judgment will thus be denied with respect to Count II.

**IV.    Counts III and IV: Interference and Retaliation in Violation of the FMLA, 29 U.S.C. § 2601 *et seq.***

In her third and fourth claims, Ms. Smith alleges that the defendants interfered with her rights to take leave under the FMLA both by discouraging her use of such leave and by considering her use of FMLA leave as a negative factor in their adverse employment actions, and that they retaliated against her for exercising her rights under the statute. These claims, however, are time-barred by the FMLA's statute of limitations.

The statute of limitations for claims under FMLA is two years, but a three-year statute of limitations applies when the violation is properly alleged to have been willful. 29 U.S.C. §§ 2617(c)(1)-(2). "Willful" violations occur when the employer "knew or showed reckless disregard [as to] whether its conduct was prohibited [by the FMLA]." *Settle v. S.W. Rodgers Co.*, 182 F.3d 909 (4th Cir. 1999) (unpublished) (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 130, 135 (1988)). "To raise a genuine issue of material fact, the Plaintiff must present some evidence of 'willfulness' through depositions, affidavits, answers to interrogatories, or admissions on file." *Bosse v. Baltimore County*, 692 F. Supp. 2d 574, 583 (D. Md. 2010) (quoting *Washington v. Purdue Farms, Inc.,* No. 4:07–3552–TLW–TER, 2009 WL 386926, at *8 (D.S.C. Feb. 13, 2009)).

As Ms. Smith filed her complaint on April 24, 2020, or two years and three-hundred-and-sixty-three days after she was notified of her termination, her FMLA claims would only be timely if the violations were properly alleged to be willful. Courts have generally "found no willfulness where the employer granted the employee's request for leave." *Honeycutt v. Baltimore Cnty.*, No. JFM–06–cv–0958, 2007 WL 1858691, at *3 (D. Md. June 18, 2007), *aff'd*, 278 Fed. Appx. 292 (4th Cir. 2008)). "Attempts to accommodate an employee's disability or condition also indicate a lack of willfulness on the employer's part." *Id.*

Ms. Smith does not dispute that she applied for and was promptly granted intermittent FMLA leave for her qualifying condition. (ECF 50-1 at 156:8-158:6). She also does not claim that

the defendants denied her requests for leave at any time between September 2016, when she began using the leave, and her termination in April 2017. (*Id.* at 160:8-25). Ms. Smith attested to the fact that, whenever she requested to take FMLA leave, she merely needed to notify her management team that she was taking the leave, and they would universally reply with "okay" or "feel better." (*Id.*). Substantial evidence demonstrates that the defendants granted all of Ms. Smith's leave requests and attempted to accommodate her periodic anxiety through use of leave.

Ms. Smith advances a slightly different argument to prove willfulness: evidence of pretext in her termination demonstrates the defendant's willfulness to prevent her from using FMLA leave in the future. Specifically, she argues that the timing of the allegedly discriminatory alteration of her work queue, approximately three months after she began taking FMLA leave, demonstrates willfulness. While the timing of the adverse employment actions may evince causation, the three-month gap between Ms. Smith beginning to use FMLA leave and her first complaint of discrimination does not on its own convincingly demonstrate that the defendants willfully interfered with Ms. Smith's use of leave.

Additionally, Ms. Smith contends that a jury could find the defendants willfully interfered with the exercise of her rights under the FMLA by allowing her leave to negatively impact her performance evaluations. In support of this theory, Ms. Smith cites to *Bosse v. Baltimore County*, a case in which the court determined that willfulness "could be inferred because the Defendants allowed Plaintiff's FMLA leave time to impact his performance evaluations negatively." 692 F. Supp. 2d at 584. In *Bosse*, the court relied on documentary evidence (performance evaluations suggesting that the plaintiff "continue working on" and "improve" his use of unscheduled leave time) referencing leave time to allow the plaintiff's FLMA claim to survive summary judgment. *Id.*

This approach, however, fails to demonstrate a genuine dispute of material fact, as Ms. Smith does not produce evidence that the defendants negatively accounted for her FMLA leave in performance evaluations. Though the record contains numerous performance evaluations, Ms. Smith does not identify a single document that accounted for or otherwise mentioned her leave. The only mention of her leave in relation to her performance in evidence came from her original meeting to discuss her complaint of discrimination with Mr. Woodall on December 21, 2016. After she informed him that she was having trouble making her budget that month, he responded that she had some valid points, and asked her if her use of leave could be contributing to the challenges she was experiencing. (ECF 50-1 at 205:4-24). After Ms. Smith denied that it did, there is no evidence that Mr. Woodall raised the issue again.[8] A single, neutral question regarding Ms. Smith's use of leave five months before her termination is insufficient evidence for a reasonable jury to conclude that the defendants recklessly or otherwise willfully interfered with Ms. Smith's rights under the FMLA by altering her assignment of high-dollar accounts.

Because the record lacks any substantial evidence that the defendants willfully interfered with or disregarded Ms. Smith's right to take unpaid leave under the FMLA, her FMLA interference and retaliation claims are time-barred under the two-year statute of limitations. Summary judgment will be granted as to Counts III and IV.

## V.   First Motion to Strike Ms. Smith's Declaration

The court will next examine the defendants' motion to strike (ECF 57) Ms. Smith's declaration (ECF 50-17, Ex. 17, Smith Decl.), which they argue cannot be used to contradict her prior sworn deposition testimony. While an affidavit or declaration written subsequent to a

---

[8] The defendants also point out that another important performance metric, account interactions per hour, is not negatively impacted by hours not worked while employees take leave.

deposition may, in some cases, provide the court with additional information at the summary judgment stage if it supplements an incomplete record, *see, e.g.*, *Johnson v. Ford Motor Co.*, 13 F.4th 493, 501 (6th Cir. 2021), the court had no need to reference Ms. Smith's declaration to rule on the defendants' motion for summary judgment. Accordingly, the first motion to strike will be denied as moot.

## VI.    Second Motion to Strike EEOC Determination

The defendants' second motion to strike (ECF 58) addresses Ms. Smith's use of the favorable EEOC determination (ECF 50-36, Ex. 36, EEOC Determination) in her response to the defendants' motion for summary judgment. The defendants argue that, given the limited record in front of the EEOC, the agency determination is more prejudicial than probative and cannot create a genuine dispute of material fact. Again, because the court did not rely on the exhibit to rule on the motion for summary judgment,[9] the second motion to strike will be denied as moot.

## CONCLUSION

For the reasons stated above, the court will grant in part and deny in part the defendants' motion for summary judgment and deny both the defendants' motions to strike. A separate Order follows.

6/29/22
Date

Catherine C. Blake
United States District Judge

---

[9] While the court did reference the document, this was merely to inform the procedural history of the case, and not to support any substantive factual or legal conclusion.